## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

Professor Brian Biles          )
                                       )
              Plaintiff,       )
                                       )
v.                                     )
                                     )
Department of Health and     )     Civil Action No. 11-1997 (ABJ)
Human Services           )
                                     )
              Defendant.     )
_____)

### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56, the Department of Health and Human Services (HHS), respectfully moves for summary judgment in this action, which was brought pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552 *et seq*. Specifically, Plaintiff seeks information submitted to the Centers for Medicare and Medicaid Services (CMS) by Medicare Advantage Organizations. The requested records contain commercial information that is protected from release by 5 U.S.C. § 552(b)(4).

As grounds for this motion, Defendant asserts that there are no genuine issues of material fact and that HHS is entitled to judgment as a matter of law. A statement of genuine issues of material fact not in dispute and memorandum of points and authorities are attached hereto.

Dated: April 30, 2012                              Respectfully submitted,


                                                   RONALD C. MACHEN JR. DC BAR #447889
                                                   United States Attorney
                                                   For the District of Columbia

                                                   DANIEL F. VAN HORN, D.C. BAR # 924092
                                                   Acting Civil Chief

                                                           /s/
                                      By:    _____
                                                   HEATHER D. GRAHAM-OLIVER
                                                   Assistant United States Attorney
                                                   Judiciary Center Building
                                                   555 4th St., N.W.
                                                   Washington, D.C. 20530
                                                   (202) 305-1334
                                                   heather.graham-oliver@usdoj.gov

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

| | |
|---|---|
| Professor Brian Biles | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| Department of Health and | )    Civil Action No. 11-1997 (ABJ) |
| Human Services | ) |
| | ) |
| Defendant. | ) |

---

**DEFENDANT'S STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE**

Pursuant to Local Civil Rule 7(h), Defendant United States Department of Health and Human Services ("HHS") respectfully submits this Statement of Material Facts Not in Genuine Dispute.

1.     Plaintiff filed a July 18, 2011, FOIA request seeking "specific data and other information for 2009 provided to CMS, in or about June of 2010, by all Medicare Part C Medicare Advantage organizations on WORKSHEET 1 – MA BASE PERIOD EXPERIENCE AND PROJECTION ASSUMPTIONS."  Marquis Decl. ¶¶ 6-7. Plaintiff attached a blank copy of the worksheet and specifically noted that he did not seek the data in Sections IV and V.  *Id*. ¶ 7.

2.     After receiving the Plaintiff's FOIA request, the CMS FOIA Division sent the request to the Center for Medicare (CM) to search for and retrieve the requested data.  Marquis Decl. ¶ 11. CM is comprised of multiple groups and divisions, including the Medicare Plan Payment Group (MPPG).  *Id.*  MPPG develops all bidding and payment policies related to the Medicare Prescription Drug Benefit and the  MA program for the individual and employer sponsored group market. *Id.* This includes rules regarding how plans are to structure their bids,

bid review criteria, benchmark computations, use of beneficiary rebates, development and refinement of risk adjustors, low income subsidy, reinsurance, risk sharing, and the MA regional stabilization fund. *Id*. This was the reasonably likely location of the specific worksheet requested by Plaintiff.

3.      The worksheets sought by Plaintiff are submitted by MA organizations as part of the Plan's Bid Pricing Tool (BPT). Rice Decl. ¶ 4.  This bid submission, in accord with 42 C.F.R. § 422.254, is the organization's estimate of the revenue required for providing coverage to an MA eligible beneficiary with a national average risk profile in a given service area. *Id.* ¶ 6. The specific data requested by Dr. Biles are cost and utilization data submitted by the MA organizations on Worksheet One of the BPT. *Id.* This data includes member months, risk score, a listing of the plans included in the report, utilization by service category, projection factors, revenue from CMS and enrollee premiums, and administrative costs. *Id.* at ¶ 6.

4.      MA organizations are Medicare-approved private insurance companies that offer health plan options for Medicare beneficiaries.  These plans cover hospital, physician, and other health services for Medicare beneficiaries who choose to enroll. Rice Decl. ¶ 5.

5.      Under the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA), and implementing regulations at 42 CFR, Medicare Advantage organizations (MAO) and Prescription Drug Plans (PDP) are required to submit an actuarial pricing "bid" for each plan offered to Medicare beneficiaries for approval by the CMS.  This information is submitted to CMS as part of the Plan's BPT.  Rice Decl. ¶ 4.  By statute, completed BPTs are due to CMS by the first Monday in June of each year. Rice Decl. ¶ 7.

6.      CMS reviews and analyzes the information provided on the BPT. Ultimately, CMS decides whether to approve the plan pricing (i.e., payment and premium) proposed by each

organization. Rice Decl. ¶ 8.  For Contract Year 2009, over 4,800 separate MA BPTs were submitted. These bids were submitted by 193 separate organizations. Rice Decl. ¶ 9.

7.      MA Organizations operate within a competitive environment. Rice Decl. ¶ 10. They compete for individual and group enrollments within a given service area. *Id.* Since 2006, payments for local and regional MA plans are based on competitive bids rather than administered pricing, and the local plans compete on various factors including price, premium, and benefit design. *Id.*

8.      MA organizations submit bid prices on a confidential basis to CMS each year. CMS uses these bids to determine plan payment and plan premium. Rice Decl. ¶ 11. If the bid of a given MA organization is relatively high in relation to the others CMS receives from its competitors, that MA organization runs the risk that no one will join the plan. *Id*. If instead the organization's bid price is lower than those of its competitors it runs the risk of being underpaid. *Id*.

9.      Some enrollment and payment data are now publicly available. Rice Decl. ¶ 14[1]. The enrollment data provides aggregate enrollment information on the number and type of MA contracts (e.g. Medicare Advantage with and without drug coverage), the number of enrollees by contract type, in addition to very detailed information on the number of enrollees by contract/plan at the state and county level. *Id*. The payment data provides information from 2006-2010 for each contract/plan including monthly average per-capita payment amount, monthly average per capita rebate amount and monthly average risk score. *Id*.

10.      Of the four sections of the Worksheet that Dr. Biles requested, CMS determined to release one section in its entirety, to partially release one section, and to withhold two sections

---

[1] The enrollment data can be found at the following site http://www.cms.gov/MCRAdvPartDEnrolData/.  The payment data can be found at http://www.cms.gov/Medicare/Medicare-Advantage/Plan-Payment/index.html.

Case 1:11-cv-01997-RCL   Document 20   Filed 04/30/12   Page 6 of 29


in full. Marquis Decl. ¶ 21. A blank worksheet showing the redactions is attached to the Marquis Declaration as Exhibit 3.  *Id.*

11.     CMS released Section I of the worksheet in its entirety. Marquis Decl. ¶ 22. Section I contains the following fields: Contract Number; Plan ID; Segment ID; Contract Year; Organization Name; Plan Name; Plan Type; MA-PD; Enrollee Type; MA Region; Acct. Swap/Equiv. Apply; SNP, Region Name; and SNP Type. *Id.*

*12.*     CMS only released the "Incurred from" and 'Incurred To" lines in field 1 of Section II.  Marquis Decl. ¶ 23.  CMS redacted the following fields from Section II: Paid Through; Member Months; Non-ESRD Risk Score; Completion Factor; and Plans in Base. *Id.* CMS also redacted the field which asked the submitter to "Describe the source of the base period experience data." *Id.*

*13.*     CMS withheld Section III in full. Marquis Decl. ¶ 25.  Section III contains detailed information about a plan's costs and utilization by specific service category. This information includes Net PMPM; Cost Sharing; Util Type; Total Benefits; Annualized Util/1000; Avg. Cost; and Allowed PMPM. *Id.*

*14.*     CMS withheld Section VI in full.  Marquis Decl. ¶ 27. Section VI contains data such as CMS Revenue; Premium Revenue; Total Revenue; Net Medical Expenses; Non-Benefit Expenses; Gains/(Loss) Margin; and Percent of Revenue.  *Id.*

15.     These withholdings were all made pursuant to FOIA Exemption 4, which protects confidential commercial information submitted to the government by outside parties. 5 U.S.C. 552(b)(4).

Respectfully submitted,

RONALD C. MACHEN JR.

DC Bar # 447889
United States Attorney for the
District of Columbia


DANIEL F. VAN HORN
D.C. Bar # 924092
Acting Civil Chief


                                    /s/
By:
_____
HEATHER GRAHAM-OLIVER
Assistant United States Attorney
555 Fourth St., N.W.
Room E4-4909
Washington, D.C. 20530
(202) 305-1334

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| **Professor Brian Biles** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **United States Department** | )   **Civil Action No. 11-1997 (ABJ)** |
| **of Health and Human Services** | ) |
| | ) |
| | ) |
| _____ | ) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Professor Brian Biles, brought this action against Defendant, the U.S. Department of Health and Human Services ("HHS"), under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, as amended, seeking declaratory and injunctive relief for HHS's alleged failure to produce documents in response to a FOIA request submitted by Plaintiff to the Centers for Medicare and Medicaid Services (CMS) on July 18, 2011. Plaintiff's request sought information submitted to CMS by Medicare Advantage organizations.

Subsequent to the filing of the lawsuit, HHS responded to Plaintiff's request and provided him with all responsive records to which he is entitled. As there are no material facts in dispute, Defendant respectfully moves this Court pursuant to Federal Rule of Civil Procedure 56 for summary judgment as to all claims asserted in this action.

I.    **BACKGROUND**

a.  **Medicare Advantage Organizations**

Plaintiff's FOIA request seeks detailed information submitted to CMS by Medicare Advantage (MA) organizations.  MA organizations are Medicare-approved private insurance companies that offer health plan options for Medicare beneficiaries.  These plans cover hospital, physician, and other health services for Medicare beneficiaries who choose to enroll. Rice Decl. ¶ 5.

Under the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA), and implementing regulations at 42 CFR, Medicare Advantage organizations (MAO) and Prescription Drug Plans (PDP) are required to submit an actuarial pricing "bid" for each plan offered to Medicare beneficiaries for approval by the CMS.  This information is submitted to CMS as part of the Plan's Bid Pricing Tool (BPT).  Rice Decl. ¶ 4.  By statute, completed BPTs are due to CMS by the first Monday in June of each year. Rice Decl. ¶ 7.

CMS reviews and analyzes the information provided on the BPT. Ultimately, CMS decides whether to approve the plan pricing (i.e., payment and premium) proposed by each organization. Rice Decl. ¶ 8.  For Contract Year 2009, over 4,800 separate MAO BPTs were submitted. These bids were submitted by 193 separate organizations. Rice Decl. ¶ 9.

MAOs operate within a competitive environment. Rice Decl. ¶ 10. They compete for individual and group enrollments within a given service area. *Id.* Since 2006, payments for local and regional MA plans are based on competitive bids rather than administered pricing, and the local plans compete on various factors including price, premium, and benefit design. *Id.*

MAOs submit bid prices on a confidential basis to CMS each year. CMS uses these bids to determine plan payment and plan premium. Rice Decl. ¶ 11. If the bid of a given MA

2

organization is relatively high in relation to the others CMS receives from its competitors, that MAO runs the risk that no one will join the plan. *Id*. If instead the organization's bid price is lower than those of its competitors it runs the risk of being underpaid. *Id*.

CMS demands integrity of the bid process by requiring all participants to have an actuary certify that the bid meets all of the requirements and has been prepared in accordance with actuarial standards of practice.  Rice Decl. ¶ 12. Submission of truly competitive bids assures that noncompetitive bid rigging or manipulation does not occur. *Id*.

In order to provide for public transparency and to comply with the Trades Secrets Act, CMS went through the rule making process regarding payment data release.  Rice Decl. ¶ 13; *see also* 76 Fed. Red. 21432.  CMS set forth the proposed elements for release and went through notice and comment rulemaking.  *Id*.  The final rule struck a balance between public accountability and maintaining confidentiality for proprietary information.  *Id*.

Some enrollment and payment data are now publicly available. Rice Decl. ¶ 14[2]. The enrollment data provides aggregate enrollment information on the number and type of MA contracts (e.g. Medicare Advantage with and without drug coverage), the number of enrollees by contract type, in addition to very detailed information on the number of enrollees by contract/plan at the state and county level. *Id*. The payment data provides information from 2006-2010 for each contract/plan including monthly average per-capita payment amount, monthly average per capita rebate amount and monthly average risk score. *Id*.

---

[2] The enrollment data can be found at the following site http://www.cms.gov/MCRAdvPartDEnrolData/.  The payment data can be found at http://www.cms.gov/Medicare/Medicare-Advantage/Plan-Payment/index.html.

### b.  Plaintiff's FOIA Request

Plaintiff filed a July 18, 2011, FOIA request seeking "specific data and other information for 2009 provided to CMS, in or about June of 2010, by all Medicare Part C Medicare Advantage Organizations on WORKSHEET 1 – MA BASE PERIOD EXPERIENCE AND PROJECTION ASSUMPTIONS."  Marquis Decl. ¶¶ 6-7. Plaintiff attached a blank copy of the worksheet and specifically noted that he did not seek the data in Sections IV and V.  *Id.* ¶ 7.

After receiving the Plaintiff's FOIA request, the CMS FOIA Division sent the request to the Center for Medicare (CM) to search for and retrieve the requested data.  Marquis Decl. ¶ 11. CM is comprised of multiple groups and divisions, including the Medicare Plan Payment Group (MPPG).  *Id.*  This was the reasonably likely location of the specific worksheet requested by Plaintiff.  MPPG develops all bidding and payment policies related to the Medicare Prescription Drug Benefit and the MA program for the individual and employer sponsored group market. *Id.* This includes rules regarding how plans are to structure their bids, bid review criteria, benchmark computations, use of beneficiary rebates, development and refinement of risk adjustors, low income subsidy, reinsurance, risk sharing, and the MA regional stabilization fund. *Id.*

The worksheets sought by Plaintiff are submitted by MA organizations as part of the BPT. Rice Decl. ¶ 4.  This bid submission, in accord with 42 C.F.R. § 422.254, is the organization's estimate of the revenue required for providing coverage to an MA eligible beneficiary with a national average risk profile in a given service area. *Id.* ¶ 6.  The specific data requested by Dr. Biles are cost and utilization data submitted by the MA organizations on Worksheet One of the BPT. *Id.* This data includes member months, risk score, a listing of the plans included in the report, utilization by service category, projection factors, revenue from CMS and enrollee premiums, and administrative costs. *Id.* at ¶ 6.

The requested records contain commercial information that is protected from release by 5 U.S.C. § 552(b)(4). Marquis Decl. ¶ 16. Exemption 4 protects "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential." Because the information sought contains confidential commercial information, it was necessary for CMS to provide the submitters pre-disclosure notification under Executive Order 12,600 and 45 C.F.R. § 5.65. *Id.* Executive Order 12,600 and 45 C.F.R. § 5.65 require Federal agencies to notify submitters of potentially confidential commercial information when a FOIA request has been submitted for records which contain potentially confidential commercial information pertaining to that submitter. *Id.* The purpose of the pre-disclosure notification is to provide submitters the opportunity to submit their input regarding the potential confidentiality of any of the records which they provided to the agency, which the submitters believe fall under the protection of FOIA Exemption (b)(4). *Id.*

Although CMS made the final disclosure determination for these records, this pre-disclosure notification process allows these companies to identify information which they believe to be exempt from disclosure as confidential business information, and provide a written substantiation for the non-disclosure of the information. Marquis Decl. ¶ 17.

Because of the large number of submitters, and in order to expedite the process, CMS contacted a sample of MA organizations. Marquis Decl. ¶ 18. The predisclosure notification letters were sent to 20 MA organizations, via certified email on January 27, 2012. *Id.* The 20 plans contacted represent over 50% of the total Medicare Advantage market. *Id.*

Nineteen of the 20 MA organizations contacted CMS with objections to disclosure. Marquis Decl. ¶ 18. The organizations strongly objected to the release of any information, the common objection being that release of this information would damage their ability to bid

5

competitively in the future to provide benefits to beneficiaries under a MA plan. *Id.* Some plans, however, identified certain data elements that could be released without harm. *Id.* CMS carefully reviewed each objection, consulted with subject matter experts at CMS including staff in the CM Medicare Plan Payment Group and the Office of the Actuary (OACT), and evaluated each data element on the worksheet. *Id.*

In OACT, the Parts C & D Actuarial Group (PCDAG) staff is responsible for the review and audit of Part C MA plans and Part D prescription drug plan bid pricing submission forms. Marquis Decl. ¶ 19. In addition, this group performs actuarial evaluations, analyses and projections of program expenditures under current law and under proposed modifications to these laws. *Id.* Included within the major duties and functions of  PCDAG are developing Part C and Part D plan bid forms and instructions; analyzing and reviewing bid data for actuarial soundness and compliance with Federal statutes, CMS guidance, and the applicable actuarial standards of practice (ASOP); performing audit reviews of  MA and Part D bids; and determining the capitation payment rates for the MA program. *Id.*

Because Dr. Biles requested information submitted by all MA Plans, CMS made a uniform determination based on the objections of submitters and in consultation with CMS subject matter experts. Marquis Decl. ¶ 20. Release of certain information submitted by one plan, while not releasing the same information about other plans, would substantially harm the plan, as it would give its competitors unfair insight into its operations. *Id.*

### c.   HHS's Disclosure Determination

Of the four sections of the Worksheet that Dr. Biles requested, CMS determined to release one section in its entirety, to partially release one section, and to withhold two sections in full. Marquis Decl. ¶ 21. A blank worksheet showing the redactions is attached to the Marquis

Declaration as Exhibit 3.  *Id.*

CMS released Section I of the worksheet in its entirety. Marquis Decl. ¶ 22. Section I contains the following fields: Contract Number; Plan ID; Segment ID; Contract Year; Organization Name; Plan Name; Plan Type; MA-PD; Enrollee Type; MA Region; Acct. Swap/Equiv. Apply; SNP, Region Name; and SNP Type. *Id.*

CMS released the "Incurred from" and 'Incurred To" lines in field 1 of Section II. Marquis Decl. ¶ 23.  CMS redacted the following fields: Paid Through; Member Months; Non-ESRD Risk Score; Completion Factor; and Plans in Base. *Id.* CMS also redacted the field which asked for the submitter to "Describe the source of the base period experience data." *Id.*

Release of the information in Section II would give a competitor unfair insight into the Plan's enrolled population. Marquis Decl. ¶ 24.  Disclosure of the risk score together with the medical per member per month ("PMPM") would give a competitor insight into how efficiently and effectively a plan provides benefits to its members. *Id.* Moreover, this information would give competitors insight into the health, risk and revenue levels of a subset of the plan's membership, allowing competitors to strategically target segments of a competitor plan's membership. *Id.*

CMS withheld Section III in full. Marquis Decl. ¶ 25.  Section III contains detailed information about a plan's costs and utilization by specific service category. This information includes Net PMPM; Cost Sharing; Util Type; Total Benefits; Annualized Util/1000; Avg. Cost; and Allowed PMPM. *Id.*

Release of the information in Section III would provide insight into how a plan delivers its benefits and give a competitor an unfair competitive advantage over other plans. Marquis Decl. ¶ 26.  For example, the average cost data is the average contract rate a plan has with

providers by service category. *Id.* With this information, a competitor could negotiate better contract rates with providers in the relevant service area. *Id.* In addition, the utilization data service category provides insight into how a plan delivers benefits and insight into its proprietary medical management process. *Id.*

CMS withheld Section VI in full.  Marquis Decl. ¶ 27. Section VI contains data such as CMS Revenue; Premium Revenue; Total Revenue; Net Medical Expenses; Non-Benefit Expenses; Gains/(Loss) Margin; and Percent of Revenue.  *Id.*

These withholdings were made pursuant to FOIA Exemption 4, which protects confidential commercial information submitted to the government by outside parties. 5 U.S.C. 552(b)(4).  In reviewing the worksheet requested by Dr. Biles, CMS considered each data element to determine whether any data element could be released. Marquis Decl. ¶ 29. CMS withheld only that information which is protected from release by Exemption 4, and provided to Dr. Biles all releasable information. *Id.*

## II.     <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate when the pleadings and evidence "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). The party seeking summary judgment must demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 248. A genuine issue of material fact is one that "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. Once the moving party has met its burden, the nonmoving party "may not rest upon the mere allegations

or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248.

FOIA cases are typically and appropriately decided on motions for summary judgment. *Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Labor*, 478 F. Supp. 2d 77, 80 (D.D.C. 2007) ("*CREW*"); *Wheeler v. Dep't of Justice*, 403 F. Supp. 2d 1, 5-8 (D.D.C. 2005). An agency may be entitled to summary judgment in a FOIA case if it demonstrates that no material facts are in dispute, it has conducted an adequate search for responsive records and each responsive record that it has located either has been produced to the plaintiff or is exempt from disclosure. *See Weisberg v. Dep't of Justice*, 627 F.2d 365, 368 (D.C. Cir. 1980). To meet its burden, a defendant may rely on reasonably detailed and non-conclusory declarations. *See McGehee v. C.I.A.*, 697 F.2d 1095, 1102 (D.C. Cir. 1983); *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), *cert denied*, 415 U.S. 977 (1974); *Wheeler*, 403 F. Supp. 2d at 6. "[T]he Court may award summary judgment solely on the basis of information provided by the department or agency in declarations when the declarations describe 'the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" *CREW*, 478 F. Supp. 2d at 80 (quoting *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981)). Here, HHS has submitted the declaration of Michael Marquis, Director of the Division of Freedom of Information, Openness, Transparency and Accountability Group, Office of Strategic Operations and Regulatory Affairs, CMS, HHS, which is reasonably detailed and explains and justifies the agency's responses to Plaintiff's FOIA request. HHS has also submitted the Declaration of Cheri Rice, Director of the Medicare Plan Payment Group in the CMS Center for Medicare.

9

### a. HHS Properly Released All Responsive, Non-Exempt Records in Response to Plaintiff's FOIA Request

The FOIA requires that an agency release all records responsive to a properly submitted request unless such records are protected from disclosure by one or more of the Act's nine exemptions. 5 U.S.C. § 552(b); *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 150-51 (1989). Once the court determines that an agency has released all nonexempt material, it has no further judicial function to perform under the FOIA and the FOIA claim is moot. *Perry v. Block*, 684 F.2d 121, 125 (D.C. Cir. 1982); *Muhammad v. U.S. Customs & Border Prot.*, 559 F. Supp. 2d 5, 7-8 (D.D.C. 2008). As demonstrated below, HHS conducted an adequate search for records responsive to Plaintiff's FOIA request and properly withheld information pursuant to Exemption 4.

### i. HHS Conducted Searches Reasonably Calculated to Uncover All Relevant Documents in Response to Plaintiff's FOIA Requests

Under the FOIA, an agency must undertake a search that is "reasonably calculated to uncover all relevant documents." *Weisberg v. Dep't of Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1983). An agency's search for records is adequate if it was "reasonably calculated to uncover all relevant documents." *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (internal quotation marks omitted); *see Oglesby v. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990) ("[T]he agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested."). A search is not inadequate merely because it failed to "uncover[] every document extant." *SafeCard Servs., Inc. v. S.E.C.*, 926 F.2d 1197, 1201 (D.C. Cir. 1991). Rather, a search is inadequate only if the agency fails to "show, with reasonable detail, that the search method . . .

was reasonably calculated to uncover all relevant documents." *Oglesby*, 920 F.2d at 68. Once an agency demonstrates the adequacy of its search, the agency's position can be rebutted "only by showing that the agency's search was not made in good faith." *Maynard v. C.I.A.*, 986 F.2d 547, 560 (1st Cir. 1993). Hypothetical assertions are insufficient to raise a material question of fact with respect to the adequacy of an agency's search. *Oglesby*, 920 F.2d at 67 n.13. "Agency affidavits enjoy a presumption of good faith that withstands purely speculative claims about the existence and discoverability of other documents." *Chamberlain v. U.S. Dep't of Justice*, 957 F. Supp. 292, 294 (D.D.C. 1997), *aff'd*, 124 F.3d 1309 (D.C. Cir. 1997).

Here, the declaration of Michael Marquis establishes that HHS conducted an adequate search. Mr. Marquis's office contacted the program which received the specific worksheets requested by Dr. Biles and had the program office provide the requested data in an excel spreadsheet, as requested by Dr. Biles.  Marquis Decl. ¶ 11. Specifically, Plaintiff's request was sent to the Center for Medicare (CM), which includes the Medicare Plan Payment Group (MPPG). *Id.* The MPPG develops all bidding and payment policies related to the Medicare Prescription Drug Benefit and the  MA program for the individual and employer sponsored group market. *Id.* All reasonably likely locations were searched for responsive records. *Id.*

## ii.    HHS Properly Asserted Exemption 4

FOIA Exemption 4 protects "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential." 5 U.S.C. § 552(b)(4).[3] The exemption encourages individuals and corporations to voluntarily furnish useful commercial or financial information to the Government, and it provides assurances to the submitter that the

---

[3]  The materials withheld under Exemption 4 also constitute trade secrets under the Trade Secrets Act, which this Circuit has held is co-extensive with Exemption 4.  *McDonnell Douglas Corp. v. Widnall*, 57 F.3d 1162, 1164 (D.C. Cir. 1995)

Government will protect its commercial interest in the information submitted. *See Sterling Drug v. FTC*, 450 F.2d 698, 709 (D.C. Cir. 1971) (citing FOIA legislative history).

To qualify for protection under Exemption 4, the requested records must consist of: (1) commercial or financial information, that is (2) obtained from a person, and (3) is privileged or confidential. *See, e.g.*, 45 C.F.R. § 5.65; *United Technologies Corp*. v. United States Dep't of Defense, 601 F.3d 557, 563 (D.C. Cir. 2010); *Gulf & Western Indus., Inc. v. United States*, 615 F.2d 527, 529 (D.C. Cir. 1980).

With regard to the first part of the test, courts have broadly construed the term "commercial" as used in Exemption 4. *See e.g., Public Citizen Health Research Group v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983) ("*Public Citizen*"); *accord Baker & Hostetler LLP v. U.S. Dep't of Commerce*, 473 F.3d 312, 319-20 (D.C. Cir. 2006). In *Public Citizen*, the D.C. Circuit held that the term "commercial" should be given its "ordinary" meaning, and specifically rejected the view that in order to qualify for Exemption 4 protection the information had to "reveal basic commercial operations." 704 F.2d at 1290. Instead, the Court held that records are commercial for Exemption 4 purposes if the submitter has a "commercial interest" in them. *Id*. at 1290; *see also*, e.g., *American Airlines v. National Mediation Bd.*, 588 F.2d 863, 870 (2d Cir. 1978) ("'commercial' surely means [information] ... dealing with commerce"). MA Plans have a commercial interest in the data they submit on Worksheet One, because they are the MA Plans' cost and utilization data submitted as part of their bid submissions, which are the organizations' estimates of the revenue required for providing coverage to an MA eligible beneficiary with a national average risk profile in a given service area. Marquis Decl. ¶ 10.

With regard to the second part of the test, the phrase "obtained from a person" includes information obtained from corporations and a wide range of other entities, as well. *See* 5 U.S.C.

§ 551(2) ("'person' includes an individual, partnership, corporation, association, or public or private organization other than an agency"); 45 C.F.R. § 5.65(b)(2); *Nadler v. FDIC*, 92 F.3d 93, 95 (2d Cir. 1996); *Allnet Communications Servs v. FCC*, 800 F. Supp. 984, 988 (D.D.C. 1992), aff'd No. 92-5351 (D.C. Cir. May 2, 1994). The data withheld pursuant to Exemption 4 was obtained from Medicare Advantage organizations. Marquis Decl. ¶ 10.  Accordingly, the data was obtained from a person.

The materials also qualify as "confidential" under the tests announced by the D.C. Circuit for FOIA Exemption 4. In *National Parks & Conservation Ass'n v. Morton*, 498 F.2d 765 (D.C. Cir. 1974) ("National Parks"), the Court of Appeals adopted a two-pronged test for determining whether commercial or financial information is "confidential" under Exemption 4:

> [C]ommercial or financial matter is "confidential" for purposes of the exemption if disclosure of the information is likely to have either of the following effects: (1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained.

*Id.* at 770.

In its subsequent en banc decision in *Critical Mass II*, the D.C. Circuit reaffirmed the two-pronged test in *National Parks*, but confined it to the category of cases to which it was first applied, namely, those in which a FOIA request is made for financial or commercial information that a person was obliged to furnish the Government. *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 872 (D.C. Cir. 1992). The Court of Appeals in Critical Mass II also recognized another basis on which materials may be withheld under Exemption 4:

> We conclude that any financial or commercial information provided to the Government on a voluntary basis is "confidential" for the purposes of Exemption 4 if it is of the kind that would customarily not be released to the public by the person from whom it was obtained.

*Id.* at 879. In doing so, the Court applied a "categorical" approach to protect voluntarily submitted information that is intended to greatly simplify the application of Exemption 4 in a significant number of cases. *Id.* at 879.

Thus, the rule in this Circuit is that confidential commercial or financial information obtained from a person can be withheld under Exemption 4 for any one of the following reasons: (1) if it is voluntarily provided by the submitter and is not of the type customarily released by the submitter; or (2) if it is compelled to be provided to the Government, it can be withheld as exempt if its disclosure would (a) impair the Government's ability to obtain the necessary information in the future, or (b) cause substantial harm to the competitive position of the person from whom the information was obtained. *Critical Mass II*, 975 F.2d at 878-79.

The information sought by Dr. Biles was required to be submitted by Medicare Advantage Plans pursuant to 42 C.F.R. § 422.254, which states that "[n]ot later than the first Monday in June, each MA organization must submit to CMS an aggregate monthly bid amount for each MA plan (other than an MSA plan) the organization intends to offer in the upcoming year…"  Therefore, the material is confidential commercial information if its disclosure would (a) impair the Government's ability to obtain the necessary information in the future, or (b) cause substantial harm to the competitive position of the person from whom the information was obtained. *Critical Mass II*, 975 F.2d at 878-79.  Defendant need only prove one of the prongs in order to properly withhold the documents.  *Judicial Watch v. Dep't of the Treasury*, 796 F. Supp. 2d 13, 37 (D.D.C. 2011). Here, Defendant can prove that the materials are confidential based on both of these prongs.

iii.    **Release of the Withheld Materials Will Cause Substantial Harm to the Competitive Positions of Medicare Advantage Plans**

The D.C. Circuit does not require that a party show "actual competitive harm" in order to make an adequate showing of the likelihood of substantial competitive harm. *Pub. Citizen Health Research Group v. FDA*, 704 F.2d 1280, 1291 (D.C. Cir.) (quoting *Gulf & W. Indus.*, 615 F.2d at 530). Rather, "evidence revealing '[a]ctual competition and the likelihood of substantial competitive injury' is sufficient to bring commercial information within the realm of confidentiality." *Kahn v. Fed. Motor Carrier Safety Admin.*, 648 F. Supp. 2d 31, 36 (D.D.C. 2009) (quoting *Pub. Citizen*, 704 F.2d at 1291). Although conclusory and generalized allegations of substantial competitive harm are insufficient to justify the application of Exemption 4, "the court need not engage in a sophisticated economic analysis to determine whether there is a likelihood of substantial competitive injury." *Id.* (citing *Public Citizen*, 704 F.2d at 1291). "The harm contemplated by Exemption 4 is that which may flow from competitors' use of the released information . . . ." *Pub. Citizen Health Research Group v. Food & Drug Admin.*, 704 F.2d 1280, 1291 n.30 (D.C. Cir. 1983). The declarations of Michael Marquis and Cheri Rice establish that disclosure of the withheld information would cause competitive harm to the plans.

This Circuit has held that it is "virtually axiomatic" that releasing detailed and comprehensive financial records would result in substantial competitive harm. *National Parks & Conservation Asso. v. Kleppe*, 547 F.2d 673, 684 (D.C. Cir. 1976). Indeed, pricing and cost information submitted by outside parties is exactly the type of information that Exemption 4 is intended to protect.  In a recent case, this court determined that releasing unit prices in a contract would cause harm because the requested information "could reveal [the submitter's] business strategy and cost structure." *Essex Electro Eng'rs, Inc. v. United States Secy. of the Army*, 686 F.

15

Supp. 2d 91, 94 (D.D.C. 2010) (citing *Pub. Citizen Health Research Group v. Food & Drug Admin.,* 704 F.2d 1280, 1291, 227 U.S. App. D.C. 151 & n.30 (D.C. Cir. 1983) and *Canadian Commercial Corp. v. Dep't of the Air Force*, 514 F.3d 37, 40, 379 U.S. App. D.C. 354 (D.C. Cir. 2008)); *see also McDonnell Douglas Corp. v. United States*, 375 F.3d 1182, 1189 (D.C. Cir. 2004) (holding that the disclosure of option year prices would inform the bids of the plaintiff's rivals, causing plaintiff substantial competitive harm.).

This Circuit has also protected bid information under Exemption 4 in other circumstances. In *Gulf & W. Indus. v. United States*, the Court held that

> [the submitter's] competitors would be able to accurately calculate [the submitter's] future bids and its pricing structure from the withheld information. The deleted information, if released, would likely cause substantial harm to [the submitter's] competitive position in that it would allow competitors to estimate, and undercut, its bids. This type of information has been held not to be of the type normally released to the public and the type that would cause substantial competitive harm if released.

615 F.2d 527, 530-531 (D.C. Cir. 1980) (citations omitted). Similarly, releasing the withheld Medicare Advantage data would allow competitors to estimate and undercut bids. Rice Decl. ¶ 27.

Releasing the requested Worksheet One data would cause harm by providing proprietary plan information that is not publicly available. Rice Decl. ¶ 18; *see also* Marquis Decl. ¶¶ 24, 26. Worksheet One contains member months which provide more detail than the publicly available plan enrollment data since member months provide how long enrollees were enrolled in the plan during the year. *Id.* Release of such information would provide insight into enrollment stability and market share. *Id.* The member months on Worksheet One are also split by DE# and non-DE#. *Id.* DE# is a subset of enrollees dually eligible for Medicare and Medicaid and non-DE# comprises the remaining enrollees. *Id.* Release of such details about a plan's enrollment would

cause harm by providing information about the plan's market strategy and target market. *Id.*
Release of the utilization and cost by service category would cause harm by providing financial
details about the plan,what services the enrollees of the plan utilize, and the underlying costs
incurred by the plan. *Id.*

While CMS has recently released plan payment information, the revenue reported on
Worksheet One of the BPT provides more detail than the publicly released data. Rice Decl. ¶ 19.
Worksheet One includes the bid portion of the payment and the rebates to buy down A/B cost
sharing and the rebates to buy down the cost for additional benefits. *Id.* The recently released
plan payment information contains the bid portion of the payment and the total rebate, which
includes the two components reported on the bid pricing tool as well as the rebates allocated to
buy down the Part B and Part D premium. *Id.* If the CMS revenue information reported on the
bid pricing tool were released, it could be used in conjunction with the plan payment data to
determine how an organization has chosen to allocate its MA rebates. *Id.* Release of such
information would cause competitive harm to the organization as it would provide information
about the market strategy of the organization. *Id.*

Release of the administrative cost information reported on Worksheet One of the BPT
would cause harm since it would provide information about the efficiency of operations and the
financial position of the organization. Rice Decl. ¶ 20.

Competitors could use the information from Worksheet One to calculate - to a reasonable
approximation based on educated estimates - the amount of an organization's bids. Rice Decl. ¶
21. If an MA organization's competitors can reverse-engineer that organization's bid amount, the
competitors would gain an unfair competitive advantage in bidding for future MA contracts. *Id.*

If competitors learn key aspects of the financial information contained in a MA organization's bids through the requested disclosure, they will be in a position to undermine the organization's position by modifying their product design and pricing in subsequent years. Rice Decl. ¶ 22.  Moreover, since the requested payment data covers a three year period, knowledge of an organization's bid over a period of time for all of its MA plans could seriously undermine its position in the marketplace. *Id.* In a competitive environment, inappropriate knowledge of a competitor's bid allows an organization to manipulate its bid in a way to exploit differences in cost and benefit design. *Id.* Giving a competitor access to an organization's bid information for all of its MA plans over a several year period also gives the competitor access to a range of other confidential information, including cost trends from year to year and comparisons of bids across types of plans, which could reveal profit objectives and, in turn, business growth strategies. *Id.*

This detailed financial information is precisely the type of information that Exemption 4 protects and release of this information would cause substantial harm to the competitive positions of Medicare Advantage organizations.  Accordingly, summary judgment should be granted in HHS's favor.

> iv.   **Release of the Withheld Documents Would Impair the Government's Ability to Obtain Necessary Information in the Future**

Release of the information withheld under Exemption 4 would also impair the Government's ability to obtain the necessary information in the future and impair the Medicare Advantage program. *See National Parks*, 498 F.2d at 770.  Even where a submission is mandatory, release of commercial and financial information can impair the government's ability to rely on future submissions. *Judicial Watch, Inc. v. Exp.- Imp. Bank*, 108 F. Supp. 2d 19, 29 (D.D.C. 2000) ("The government has a compelling interest in ensuring that the information it

receives is of the highest quality and reliability, and disclosure of potentially sensitive commercial and financial information, *even where submissions of information are mandatory*, would jeopardize the Bank's ability to rely on any such information that is submitted. A lack of reliability would cripple the Bank's ability to make rational decisions regarding the viability of future export insurance transactions, thereby hindering the Bank's ability to fulfill its statutory purpose.") (emphasis supplied).

The declarations of Cheri Rice and Michael Marquis establish that release of the withheld data would impair the government's ability to obtain this information in the future. Disclosure of the requested information would undermine the integrity of the bidding process mandated by the Social Security Act at section 1854 and, in so doing, impair CMS's ability to obtain necessary information in the future. Rice Decl. ¶ 23. The purpose of the bidding process brought on by the MMA was to incite competition. *Id.* Yet, as stated above, if the requested data were disclosed, competitors could ascertain (or at least estimate to a reasonable approximation) bid amounts. *Id.* If MA organizations could ascertain past bid amounts, they could use that information to predict future bid amounts and to adjust their own future bids. *Id.* This, of course, would undermine the integrity of the bidding process. *Id.*

Moreover, disclosure of the requested data would negatively affect the reliability and/or quality of bids submitted to CMS. Rice Decl. ¶ 24. If a MA organization knew that its competitors would be able to decipher its bids, it would be less likely to provide detailed and reliable information to CMS in the future. *Id.* This would impair CMS's ability to properly evaluate future bids under section 1854(a)(6)(B) of the Social Security Act (42 U.S.C. § 1395w-24(a)(6)(B)). *Id.*

When competitive bidding is compromised and possibly eliminated by knowledge of

19

what competitors in a market have bid, the result would be higher bids, lower government savings, higher beneficiary out-of-pocket costs and less rich benefit packages. Rice Decl. ¶ 25.

The MA program is specifically designed to expand the number and type of private plans available to Medicare beneficiaries; to enrich the range of benefit choices available to enrollees; and to advance the goal of improving the quality and increasing efficiency in the overall health care system. Rice Decl. ¶ 26.  It is premised on a competitive bid process which works in the following way: private health plans bid to cover Part A and Part B benefits for prices lower than the benchmark, as previously described. *Id.* Most plan bids are lower than the benchmarks; and when this occurs, a percentage of the benchmark-bid difference is retained by the Medicare Trust Funds as savings and the rest is used by the plan to reduce beneficiary out-of-pocket costs and offer richer benefit packages. *Id.* CMS's expectation, and also that of Congress in enacting the MMA, is that "over time" participating plans will be under continued competitive pressure to improve their benefits, reduce their premiums and cost sharing, and improve their networks and services, in order to gain or retain enrollees. *Id.*

Release of the requested bid data undermines the fundamental objective of the MA bid process. The underlying purpose for the competitive bid process is to encourage bidding organizations to bid, consistent with their revenue requirements, as low as possible. Rice Decl. ¶ 27.  Because CMS retains a percentage of the savings when bids are below the payment benchmark, lower bids result in greater savings in CMS. *Id.* However, if a competitor has information that can be used to project future bids, the competitor's objective would no longer be to submit a bid as low as possible; rather the objective would be to present a bid that gives that organization a competitive edge over its competing organizations. *Id.* This shift in motivation is likely to reduce the MA savings resulting from the bid. *Id.*

This is because instead of competing to offer the richest benefit package and provider network at the lowest possible price, plans may compete to offer benefit packages similar to their competitors that are at or just below their competitors' prices, which may be higher than the plans would otherwise have submitted. Rice Decl. ¶ 28. Plans would no longer work to figure out and submit the lowest possible price for a benefit package; instead, they would work to figure out and submit bids at or slightly lower than their competitors' bids. *Id.* The confidentiality of bid prices makes plans guess and attempt to bid for the lowest price. *Id.* For this reason, CMS has established a rigid timeline for bid submission and revision. *Id.* The purpose for this rigid timeline and the confidentiality of bid information is to assure a meaningful bid process and a level playing field. *Id.* Disclosure of the requested payment data undermines both objectives. *Id.*

Because release of this information would impair HHS's ability to obtain this information in the future and impair the Medicare Advantage program, it is protected from release by Exemption 4. *See Critical Mass*, 975 F.2d at 878. Accordingly, Defendant's motion for summary judgment should be granted.

### v.   HHS Complied With FOIA's Segregability Requirement

Under the FOIA, if a record contains information exempt from disclosure, any "reasonably segregable," non-exempt information must be disclosed after redaction of the exempt information. 5 U.S.C. § 552(b). Non-exempt portions of records need not be disclosed if they are "inextricably intertwined with exempt portions." *Mead Data Cent., Inc. v. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977). To establish that all reasonably segregable, non-exempt information has been disclosed, an agency need only show "with 'reasonable specificity'" that the information it has withheld cannot be further segregated. *Armstrong v.*

*Executive Office of the President*, 97 F.3d 575, 578-79 (D.C. Cir. 1996); *Canning v. Dep't of Justice*, 567 F. Supp. 2d 104, 110 (D.D.C. 2008).

Where non-exempt information could be segregated from exempt information, CMS segregated and disclosed the non-exempt data. Marquis Decl. ¶ 29.  CMS considered each data element to determine whether any data element could be released. *Id.* CMS withheld only that information which is protected from release by Exemption 4, and provided to Plaintiff all releasable information. *Id.*

**III.**    **CONCLUSION**

For the reasons set forth above, Defendant respectfully requests that this Court grant its motion for summary judgment as to all claims in this case.

                              Respectfully submitted,

                              RONALD C. MACHEN JR.
                              DC BAR #447889
                              United States Attorney
                              For the District of Columbia


                              DANIEL F. VAN HORN,
                              D.C. BAR # 924092
                              Acting Civil Chief


                                    /s/
                    By:    _____
                              HEATHER D. GRAHAM-OLIVER
                              Assistant United States Attorney
                              Judiciary Center Building
                              555 4th St., N.W.
                              Washington, D.C. 20530
                              (202) 305-1334
                              heather.graham-oliver@usdoj.gov