## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| **BRIAN BILES** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil No.  11-1997** |
| | ) | |
| **DEPARTMENT OF HEALTH AND** | ) | |
| **HUMAN SERVICES** | ) | |
| | ) | |
| **Defendant.** | ) | |

_____)

### MEMORANDUM OPINION

Plaintiff Brian Biles, MD, MPH ("Dr. Biles"), brings an action against defendant U.S. Department of Health and Human Services ("HHS") under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 (2012), for injunctive relief, claiming that HHS is unlawfully withholding information that Dr. Biles requested in a proper FOIA request.  HHS claims that the information is properly withheld under FOIA's Exemption Four because the release of the information would cause substantial competitive harm to the private health insurance companies that submitted the requested data to HHS in 2010 and would impair HHS's ability to obtain accurate information in the future.

Before the Court is defendant's Motion for Summary Judgment, ECF No. 20, April 30, 2012, and plaintiff's Cross Motion for Summary Judgment, ECF No. 24, July 13, 2012.  Upon consideration of defendant's motion, plaintiff's cross motion and opposition, defendant's reply and opposition, ECF No. 27, Aug. 13, 2012, plaintiff's reply, ECF No. 30, Sept. 10, 2012, the applicable law, and the record herein, the Court will DENY defendant's motion and GRANT plaintiff's motion.

## I.      BACKGROUND

On July 18, 2011, plaintiff Dr. Biles—a professor at The George Washington University School of Public Health and Health Services who studies the Medicare Advantage ("MA") program—filed a FOIA request with defendant HHS's Centers for Medicare and Medicaid Services ("CMS"), which oversees the Medicare Advantage ("MA") program.  Pl.'s Mem. in Opp'n to Def.'s M. Summ. J. & in Supp. of Pl.'s M. Summ. J. ("Pl.'s Mem.") 2, ECF No. 24-1; Biles Decl. ¶ 1, Exh. A (CV), ECF No. 24-2; Def.'s Mem. in Supp. of Def.'s M. Summ. J. ("Def.'s Mem.") 4, ECF No. 20.  In order to analyze the efficiency and effectiveness of the MA and Medicare programs, Dr. Biles requested "specific data and other information for 2009 provided to CMS, in or about June 2010, by all Medicare Part C Medicare Advantage Organizations on WORKSHEET 1—MA BASE PERIOD EXPERIENCE AND PROJECTION ASSUMPTIONS."  Pl.'s Complaint ¶ 1; Def.'s Mem. 4; Biles Decl. Ex. F, at 1 (FOIA Request).

Medicare Advantage organizations ("MAOs") are private insurance companies that offer health insurance coverage to Medicare beneficiaries and are required, pursuant to 42 C.F.R. § 422.254, to submit a Bid Pricing Tool to CMS by the first Monday of June each year.  Rice Decl. ¶¶ 5, 7–9, ECF No. 20-1; Pl.'s Mem. 2.  The Bid Pricing Tool is an Excel workbook comprised of seven worksheets of data that determine the projected costs and revenue for an MAO to provide coverage to MA beneficiaries in the next calendar year.  Def.'s Mem. 4; Pl.'s Mem. 1–3; Rice Decl. ¶¶ 5–7, 12.  The "bid" submitted by MAOs is not like a traditional bid in a competitive arena where one winner takes all, as in bids for government contracts.  Pl.'s Mem. 7.  CMS explains:

> [T]he MA . . . program[] [is] not competitive in the way that term is normally understood.  Although [MAOs] do compete for members, primarily through the

benefits offered and the cost (member cost sharing and premium) of those benefits, they do not directly compete for the payments that CMS makes.[1]

CMS "approve[s] all sustainable bids that are otherwise qualified without preference for the lowest bidder."[2]  76 Fed. Reg. at 21,518.

Further unlike a competitive bid for a contract where the bidder can choose his desired bid amount, an MAO's "bid" is based on the MAO's actual costs expended by the MAO in the previous year to provide its offered Medicare benefits; this data is called the MAO's "base period" data and is the category from which Dr. Biles has requested specific data.  Pl.'s Mem. 7; see Rice Decl. ¶ 6.  Base period data must be verified by an actuary.  Pl.'s Mem. 15, 42; Rice Decl. ¶ 12; 76 Fed. Reg. at 21,518 (statement by CMS/HHS) ("Utilization, costs, and trends must be certified by a qualified, independent actuary prior to bid submission.");  42 C.F.R. § 422.254(b)(5) (2012).

Ultimately, the "bid" data is trended forward to the next year by a series of formulae, like inflation and other factors, embedded in the seven Excel worksheets of the Bid Pricing Tool.  Pl.'s Mem. 7; see Rice Decl. ¶ 6; 76 Fed. Reg. at 21,517.  The formulae calculate the bid data to determine the expected revenue needed to cover the MAO's projected Medicare costs for the next year.  Pl.'s Mem. 7; Rice Decl. ¶ 6; 42 C.F.R. § 422.245(a)(1) (2012).  This "payment plan" is the basis for CMS's payments to an MAO, and CMS pays MAOs one year in advance to cover its portion of the MAOs' projected cost and revenue requirements for the next year.  See id; Rice

---

[1] Medicare Program; Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs for Contract Year 2012 and Other Changes, 76 Fed. Reg. 21,432, 21,518 (Apr. 15, 2011) (final rule) (CMS/HHS responding to and refuting claims by MAOs that some of the payment data collected by the bidding process should not be released to the public due to a risk of competitive harm).

[2] CMS "may decline to approve a bid if the [MAO] proposes significant increases in cost sharing or decreases in benefits offered under the plan" and CMS may only approve bids where (1) "[t]he bid amount and proportions are supported by the actuarial bases provided by [the MAO]," (2) "[t]he bid amount and proportions reasonably and equitably reflects the plan's estimated revenue requirements for providing the benefits under that plan," (3) the bid places limitations on enrollee cost sharing,  and (4) the bid's benefit package and plan costs are "substantially different from [the MAO's] other bid submissions . . . of [the same] plan type with respect to premiums, benefits, or cost-sharing structure."  42 C.F.R. § 422.256(a)–(b) (2012).

Decl. ¶¶ 6–11; Pl.'s Mem. 7; 42 C.F.R. § 422.254(a)(1) (2012).  For example, an MAO's 2011 payment plan is based on 2009 actuarial data.  *See* Pl.'s Mem. 7; Rice Decl. ¶ 12.

Additionally, while the payment plan is determined according to the MAO's estimated internal costs, the payment amount is limited by a federally-set benchmark, which is the maximum amount CMS will pay an MAO in a given locality.  *See* 42 U.S.C. § 1395w-23(b)(1)(B) (2012); 42 C.F.R. § 422.258 (2012).  The benchmarks are publicly announced by the first Monday in April of the year prior to the bid submissions to which the benchmarks will apply.  42 U.S.C. § 1395w-23(b)(1)(B).

Dr. Biles requested "retroactive," "historical" cost and utilization data from Sections I, II, III, and VI of Worksheet One[3] of the Bid Pricing Tool and claims to have not requested any data that "disclose[s] MAO assumptions, predictions, projections, or expectations for how th[o]se costs may change in the future."  Pl.'s Mem. 8; Def.'s Mot. Summ. J. Ex. 1; Def.'s Mem 4 ("Def.'s Statement of Material Facts Not in Genuine Dispute") ¶ 3; Biles Decl. ¶¶ 58–60, 95.  Section I was released to Dr. Biles by CMS and is therefore not in dispute.  Biles Decl. ¶ 96; Def.'s M. Summ. J. Exs. 1–3, Ex. 4 at 2.  Sections II, III, and VI are in dispute, as CMS refuses to disclose those sections in their entirety pursuant to FOIA's Exemption Four.  Pl.'s Mem. 3, Exs. 3–4; Marquis Decl. ¶¶ 21–27, ECF No. 20-2.

---

[3] Worksheet One of the Bid Pricing Tool requires an MAO to submit the following information from the prior year: (1) member months (the number of months each enrollee was enrolled in the plan during the year; (2) risk score (an indicator of the risk profile, or cost potential, of the enrolled population); (3) plan list (what type of plans are included in the reporting); (4) utilization by service area (how many times enrollees received each service); (5) average cost by service category; (6) projection factors; (7) revenue from CMS and enrollee premiums; (8) administrative costs.  Rice Decl. ¶ 6.  Dr. Biles has requested only some of these categories of information.  Pl.'s Mem. 3, Exs. 3–4; Marquis Decl. ¶¶ 21–27.

Section II contains base period background information that defines the period of time that Section III data[4] reflects and includes the "Paid Through Date,"[5] "Member Months,"[6] and the "Non ESRD Risk Score,"[7] along with other background data.  Biles Decl. ¶ 97–107.

Section III is retrospective 2009 cost and utilization data for various types of health services the MAO covers in its offered plans.  Biles Decl. ¶ 108.  Section III includes the rates that each service was utilized during 2009 and automatically populates the average cost per utilization.  Biles Decl. ¶¶ 111–12.  Section III also provides the costs per member per month ("PMPM") by service category for the base period; the total PMPM costs for a type of health service are the result of three factors—the price paid for services, the quantity of services used, and the intensity of services (the extent that highly expensive new technology was used).  Biles Decl. ¶¶ 112–13.

Section VI reflects the MAO's revenue for the calendar year as well as non-benefit expenses, like internal operating costs, that were required to provide the services described in Section III for the 2009 calendar year.  Biles Decl. ¶ 114.

---

[4] The experience data is based on costs incurred for providing MA benefits during calendar year 2009.  Biles Decl. ¶ 97.

[5] This is the date in 2010 through which the MAO has paid its 2009 claims.  Biles Decl. ¶ 98.

[6] This is the number of months each enrollee was covered by the MAO plan during 2009.  Biles Decl. ¶ 99.

[7] This is a projected risk score upon which the 2010 payment plan was based.  Biles Decl.  ¶¶ 103–05.  A risk score is essentially the health of the MAO's enrollee population and is used to adjust CMS's payment to an MAO based on their beneficiaries' health.  *Id*.  A "Non ESRD" risk score means the risk score of the MAO's enrollees that does not includes ESRD ("End Stage Renal Disease") enrollees.  However, ESRD Medicare beneficiaries are generally prohibited by CMS from joining MAO plans, and ESRD patients comprise only 0.9 % of all Medicare beneficiaries.  Biles Supp. Decl., ¶¶ 38–39, ECF No. 30-1.  Thus, the Non ESRD Risk Score appears to be, for all practical purposes, the projected risk score of an MAO upon which the MAO's payment plan is based.  *Id.*

## II.    LEGAL STANDARD

### A.    Summary Judgment

"The court shall grant summary judgment if the movant shows that (1) there is no genuine dispute as to any material fact *and* (2) the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphasis added); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).   The mere existence of *any* factual dispute will not defeat summary judgment; the requirement is that there be no *genuine* dispute about a *material* fact.  *Anderson*, 477 U.S. 247–48.  A fact is material if, under the applicable law, it could affect the outcome of the case.  *Id.*  A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  In order for the dispute to be genuine, a nonmoving party must present enough specific facts, beyond mere allegations or conclusory statements, that would enable a reasonable jury to find in favor of the nonmoving party.  *Anderson*, 477 U.S. at 252; *Greene v. Dalton,* 164 F.3d 671, 675 (D.C. Cir. 1999).  Because the court cannot try issues of fact when determining summary judgment but can only determine whether there are issues to be tried, the nonmoving party's evidence is to be believed and all justifiable inferences are to be drawn in the nonmoving party's favor.  *Id.* at 255; *see Freeman v. Continental Gin Co.,* 381 F.2d 459, 469 (5th Cir. 1967).

The court must find that the movant is entitled to "judgment as a matter of law" in order to grant summary judgment, Fed. R. Civ. P. 56(a), and therefore must find that there is no genuine issue for trial.  There is no genuine issue for trial unless the nonmoving party provides sufficient favorable evidence to enable a jury to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 250–51 (explaining that the summary judgment inquiry is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they

may reasonably be resolved in favor of either party," agreeing that the standard for summary judgment mirrors the standard for a directed verdict under Fed. R. Civ. Pro. 50(a), and instructing that "[i]f reasonable minds could differ as to the import of the evidence . . . a verdict [or a summary judgment] should not be directed [or granted]").  The burden is on the moving party to show that there is an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

If the moving party *would* have the burden of persuasion at trial, the moving party must provide enough credible evidence to show that it is entitled to a directed verdict if not controverted at trial, which shifts the burden to the nonmoving party to show, by credible evidence, that a "genuine issue" exists.   477 U.S. at 331 (Brennan, J., dissenting) (not inconsistent with the majority opinion); *see* 10A Fed. Prac. & Proc. Civ. § 2727 (Charles Alan Wright et al. eds., 3d ed. 2012).  If the moving party would *not* have the burden of persuasion at trial, the moving party may satisfy Rule 56's burden of production by either submitting evidence that negates an essential element of the nonmoving party's claim so that the nonmoving party cannot meet their required burden of production or by *affirmatively* showing that there is no evidence on the record to support a judgment for the nonmoving party.  *Celotex*, 477 U.S. at 331–32 (Brennan, J., dissenting) (not inconsistent with the majority opinion); *see* 10A Fed. Prac. & Proc. Civ. § 2727 (Charles Alan Wright et al. eds., 3d ed. 2012).

FOIA cases are typically and appropriately decided by summary judgment.  *Brayton v. Office of the U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011).  By statute, the agency bears the burden in litigation to justify withholding any records.  5 U.S.C. § 552(a)(4).  This is in part because of the "strong presumption in favor of disclosure," *Dep't. of State v. Ray*, 502 U.S. 164, 173 (1991), and because FOIA requesters face an information asymmetry given

that the agency possesses the requested information and decides whether it should be withheld or disclosed.  *See Judicial Watch*, *Inc. v. FDA*, 449 F.3d 141, 145–46 (D.C. Cir. 2006).  Thus, even where the requester has moved for summary judgment, the Government "'ultimately [has] the onus of proving that the [documents] are exempt from disclosure.'"  *Pub. Citizen Health Research Grp. v. FDA*, 185 F.3d 898, 904–05 (D.C. Cir. 1999) (quoting *Nat'l Ass'n of Gov't Emps. v. Campbell*, 593 F.2d 1023, 1027 (D.C. Cir. 1978)).  To show an exemption's applicability, an agency may rely on reasonably detailed and non-conclusory declarations to satisfy its burden of production.  *See McGehee v. CIA*, 697 F.2d 1095, 1102 (D.C. Cir. 1983); *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981) ("[I]t is now well established that summary judgment on the basis of such agency affidavits is warranted if the affidavits describe the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith."); *Morley v. CIA*, 508 F.3d 1108 (D.C. Cir. 2007) ("'Conclusory and generalized allegations of exemptions' are unacceptable." ) (citations omitted).

## B.      Freedom of Information Act

The Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 (2012), generally provides that any person has a statutory right, enforceable in court, to obtain access to executive branch federal agency records, except to the extent that such records, or portions of them, are protected from public disclosure by one of nine exemptions or by one of three additional special law enforcement record exclusions.  *See* 5 U.S.C. § 552(b) (2012); *Newport Aeronautical Sales v. Dep't of Air Force*, 684 F.3d 160, 162 (D.C. Cir. 2012).  The Supreme Court noted that "[t]he basic purpose of [the] FOIA is to ensure an informed citizenry, vital to the functioning of a

democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).  Exemptions "must be narrowly construed" so that the "limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act." *John Doe Agency v. John Doe Corp.,* 493 U.S. 146, 152 (1989).

The FOIA exemptions exemplify various policy interests that conflict with and ultimately supersede the basic FOIA policies of government transparency and an informed citizenry. *John Doe*, 493 U.S. at 152 ("'Congress realized that legitimate governmental and private interests could be harmed by release of certain types of information,' and therefore provided the 'specific exemptions under which disclosure could be refused.'") (citing *FBI v. Abramson*, 456 U.S. 615, 621 (1982)).  An agency seeking to withhold information under a FOIA exemption has the burden of proving that the information falls under the claimed exemption, and the district court must review the agency's decision de novo.  5 U.S.C. § 552(a)(4)(B); *Quinon v. FBI*, 86 F.3d 1222, 1227 (D.C. Cir. 1996).  Further, "[i]f a document contains exempt information, the agency must still release 'any reasonably segregable portion' after deletion of the nondisclosable portions."  *Oglesby v. U.S. Dep't of the Army*, 79 F.3d 1172, 1176 (D.C. Cir. 1996) (citing 5 U.S.C. § 552(b)).  To ensure that all reasonably segregable information has been disclosed to the requester, the district court is required to enter a finding on segregability, even if the issue of segregability has not been raised by the plaintiff.  *Trans-Pacific Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1028 (D.C. Cir. 1999).

Exemption Four to FOIA exempts from disclosure some information relating to trade secrets or commercial or financial information.  5 U.S.C. § 552(b)(4) (2012).  For Exemption Four to apply, the information must (1) involve trade secrets and commercial or financial

information, (2) be obtained from a person outside the government, and (3) be privileged or confidential. *Id.* Exemption Four was drafted to balance the strong public interest in favor of disclosure against the right of private businesses to protect sensitive information. *National Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 768–69 (D.C. Cir. 1974); *see Worthington Compressors, Inc. v. Costle*, 662 F.2d 45, 53 (D.C. Cir. 1981) ("'[A]s a matter basic to our free enterprise system, private business information should be afforded appropriate protection, at least from competitors."). Under Exemption Four, documents or information that the government *requires* an entity to provide are less rigorously protected than documents or information *voluntarily* provided to the government by the entity. *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 878–880 (D.C. Cir. 1992) (en banc) (creating the two tests for "voluntary" and "required" information and assigning the above-stated *National Parks* test to the analysis for "required" information); *see also National Parks,* 498 F.2d at 766.

## III.   DISCUSSION

For Exemption Four to apply, the information must (1) involve trade secrets or commercial or financial information, (2) be obtained from a person outside the government, and (3) be privileged or confidential. *National Parks*, 498 F.2d at 766. It is undisputed that the information in this case is financial or commercial and was obtained from a "person" outside of the government, and HHS has not claimed that the information is privileged. Pl.'s Mem. 18; Def.'s Mem. 12–13. Thus, the only disputed issue is whether or not the requested information is confidential. *Id.*

To determine whether information is confidential, the court must first determine whether the information was submitted to the government voluntarily or whether the government required the information to be submitted. *See Critical Mass*, 975 F.2d at 878–80. A submission is

compelled when the government requires a private party to submit information as a condition of doing business with the government.  *See Lepelletier v. F.D.I.C.,* 977 F. Supp. 456, 460 n.3 (D.D.C. 1997), *rev'd in part on other grounds*, 164. F.3d 37 (D.C. Cir. 1999) ("Information is considered 'required' if any legal authority compels its submission, including informal mandates that call for the submission of the information as a condition of doing business with the government"); *Judicial Watch, Inc. v. Exp.-Imp. Bank*, 108 F. Supp. 2d 19, 28 (D.D.C. 2000).  In the present case, because the requested data is required by law to be submitted to CMS by all participating MAOs, 42 C.F.R. § 422.254 (2012), the *National Parks* test for "required information" applies.  *Critical Mass*, 975 F.2d at 878–80.

Under *National Parks*, information is confidential if its disclosure is likely to (1) "impair the Government's ability to obtain necessary information in the future" *or* (2) "cause substantial harm to the competitive position of the person from whom the information was obtained."  *Nat'l Parks*, 498 F.2d at 770; *see Critical Mass*, 975 F.2d at 878.  Here, HHS contends that both prongs of the test are satisfied as a matter of law (though HHS need only prove one of the prongs to prevail) and that there are no genuine issues of material fact, thus requesting summary judgment in its favor.  Def.'s Mem. 1, 14–21.  Dr. Biles contends that HHS has not met its burden of proving with affirmative, non-conclusory evidence that Exemption Four applies in this case and therefore requests summary judgment in his favor.  Pl.'s Mem. 28.

### A.     Impairment to Government's Ability to Obtain Information in the Future

Because all MAOs are required by statute to submit the requested data to CMS in order to participate as an MAO the following year, the Government will continue to be able to obtain the data required by the mandatory Bid Pricing Tool submission even if the requested data is disclosed.  Private companies participate as MAOs because it is profitable to them, and neither

an MAO official nor HHS has suggested that an MAO would refuse to participate in the MA program if the requested data were released. *See* Pl.'s Mem. 21–22; Biles Decl. ¶ 33; Rice Decl. ¶¶ 9–10. *See generally* Rice Decl.; Marquis Decl.; Yiu Decl., ECF No. 27-5; Smith Decl., ECF No. 27-4; Theisen Decl., ECF No. 27-3; Rice Supp. Decl., ECF No 27-2.

Because HHS will continue to be able to obtain the required data, HHS focuses on the *quality* of the data the Government will be able to obtain. HHS claims that the disclosure of the requested information will cause MAOs to adjust their bids in order to compete with other MAOs' bids or to keep other MAOs from "decipher[ing] their bids," which would deprive CMS of the detailed and reliable information it now obtains. Def.'s Mem. 18–20; Rice Decl. ¶¶ 24–25. Dr. Biles disputes these claims, noting that "[i]f an MAO wishes to participate, but fails to provide the voluminous and detailed information required on the Bid Pricing Tool [and abide by the actuarial requirements], CMS is empowered not only to decline to renew their contract, but also to impose sanctions." Pl.'s Mem. 22 (citing 42 CFR § 422.254(a)(3)).

HHS fails to explain (1) how bids could be manipulated by MAOs by using the requested data when the Bid Pricing Tool requires actuary-verified data and other strict structural requirements that cannot be modified without serious consequences[8] and (2), even if MAOs were able to adjust their bids in some material way, how those adjustments would impair CMS's ability to obtain the information required by 42 C.F.R. § 422.254 in the future—as mere changes in the bid amounts do not necessarily equate to inaccurate data or CMS's inability to obtain the

---

[8] For example, CMS can impose sanctions or choose not to renew a contract, 42 C.F.R. § 422.254(a)(3), or, worse, the MAO could be subject to penalties for misrepresentation in contracting with the government under the False Claims Act, 31 U.S.C. §§ 3729–30 (2012). *See also* 42 C.F.R. § 422.254(b)(5) (a qualified actuary must certify the plan's actuarial valuation); § 422.256(b)(1) (CMS can only accept applications if the "bid amount and proportions are supported by the actuarial bases provided."); 42 U.S.C. § 1395w-27(d)(1) (2012) (CMS is required to audit the financial records (including cost and utilization data) of at least one-third of all MAOs each year.).

required information in the future.[9]  *See Gov't Accountability Project v. HHS*, 691 F. Supp. 2d 170, 175–76, 178–79 (D.D.C. 2010) (agency failed to show "how" data resulted in claimed results).

CMS claims that "[d]isclosure of the requested information would undermine the integrity of the bidding process."  Def.'s Mem. 19.  But in a 2010 response to MAOs that were claiming the exact same thing (that the release of certain payment data would undermine the integrity of the bidding process), CMS claimed that there was no risk of loss to the integrity of the bidding process, *not* because of the *type* of data that was being released, but because the bidding process consisted of actuary-verified data: "Utilization, costs, and trends must be certified by a qualified, independent actuary prior to bid submission.  Since we will continue to require actuarial certification, integrity is unaffected."  75 Fed. Reg. 21,432, 21,518.  HHS fails to dispute Dr. Biles's claim that "plans cannot simply raise bids strategically [or] willy-nilly [because] [t]here must be an actuarial basis for doing so."  Pl.'s Mem. 54.  HHS offers "nothing but speculative opinion that [MAOs] may not be forthcoming in the data they submit if [HHS] allows disclosure . . ., [though] the agency has the burden of showing that requested information

---

[9] Further, CMS does not explain how changes in the MAOs' bid amounts would pose a threat to the MA program when CMS has a benchmark amount over which CMS will not pay an MAO and when MAOs have strong incentives to remain competitive (and thus, keep their costs down and their enrollee benefits up in order to attract enrollees).  Def.'s Mem. 20; Rice Decl. ¶ 26; 76 Fed. Reg. at 21,518 ("The fact that MA-eligible Medicare beneficiaries can, on average, select from over 2 dozen MA and Part D plans in every county of the nation is ample evidence that competition is robust.").  It seems, if anything, that the MAOs would use the information to lower their bid amounts in an effort to become more competitive in the market, which saves both enrollees and the Government money; pushing the bid amount higher, as HHS claims "may" happen, does not follow as the only logical consequences of disclosure, especially when HHS claims that MAOs exist in a competitive enrollee market where enrollees, on average, have a dozen MAOs to choose from in each geographic region.  Def.'s Mem. 21; 76 Fed. Reg. at 21,518 (". . . MA-eligible Medicare beneficiaries can, on average, select from over 2 dozen MA and Part D plans in every county of the nation . . . .").  If all MAOs could ascertain the bid amounts of all the other MAOs, as would be the case here if the Government is correct, it seems most likely that, in CMS's own words, "competition, if anything, will be enhanced by release [of the data] rather than harmed in any way."  76 Fed. Reg. at 21,518; *see also id.* ("[W]here plans are free to modify the actual competitive components that are used to build up bids, such as benefit offerings and member cost-sharing, little is left of the argument that revealed cost trends will have an impact on the competitive nature of the programs.").

comes within a FOIA exemption." *Niagara Mohawk Power Corp. v. U.S. Dep't of Energy*, 169 F.3d 16, 18 (D.C. Cir. 1999) [hereinafter *Mohawk*].

Dr. Biles also cites a line of precedent holding that impairment is highly unlikely when disclosure of the information is compelled.[10]  In *Mohawk*, the court noted that disclosure of required data containing "hard, cold numbers"—a fitting description of the actuarial cost data required by the Bid Pricing Tool—refutes a conclusory claim by HHS that disclosure of the information will impair HHS's ability to obtain the information in the future.  169 F.3d at 18. This line of precedent, sourced initially from *National Parks*, is convincing to and binding on the Court.  Even if HHS's contentions are true, HHS has failed to meet its burden of showing how disclosure of the information will impair CMS from obtaining the data in the future—the first prong of the *National Parks* test.  HHS must meet its burden of production regarding the second prong of the *National Parks* test (substantial competitive harm) in order to survive an overall motion for summary judgment in Dr. Biles's favor.

### B.    Substantial Competitive Harm

To prove a likelihood of substantial competitive harm, HHS must prove that (1) the submitters of the information "actually face competition" and that (2) "substantial competitive

---

[10] *Niagara Mohawk Power Corp. v. U.S. Dep't of Energy*, 169 F.3d 16, 18 (D.C. Cir. 1999); *Critical Mass*, 975 F.2d at 878; *Nat'l Parks*, 498 F.2d at 770; *Ctr. For Auto Safety*, 244 F.3d at 148; *In Defense of Animals v. USDA*, 656 F. Supp. 2d 68, 72 (D.D.C. 2009) ("Where the government obtains information involuntarily, disclosure does not impair the government's ability to obtain similar information in the future."); *Kahn v. Fed. Motor Carrier Safety Admin.*, 648 F. Supp. 2d 31, 36 (D.D.C. 2009); *People for Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 2005 WL 1241141, *5 (D.D.C. May 24, 2005).

HHS cites *Judicial Watch, Inc. v. Exp.-Imp. Bank*, 108 F. Supp. 2d 19, 29 (D.D.C. 2000) for support. Def.'s Mem 18–19.  In *Judicial Watch*, certain information was required to be submitted in order to apply for a loan with the Export-Import Bank. *Id.* at 30.  Despite the mandatory nature of the submission, this Court found that disclosure of the requested information would impair the Government's ability to obtain accurate information in the future, which would "hinder the Bank's ability to fulfill its statutory purpose" "to foster domestic economic growth by supporting United States export transactions that are too risky for private capital financing." *Id.*  However, *Judicial Watch* is distinguishable from the present situation, as those applying for loans are, unlike MAOs, not restricted by actuarial requirements and in competition with each other for the best loan rate. *Id.* at 24 ("[T]he Bank is authorized to provide guarantees, insurance, and extensions of credit on competitive terms to United States businesses that seek to export goods and services to other countries, particularly where private financing and insurance is unavailable because of risk factors specific to the country importing those goods.").

injury [to the submitters] would likely result from disclosure." *Nat'l Parks & Conservation Ass'n v. Kleppe*, 547 F.2d 673, 679 (D.C. Cir. 1976) ("*Nat'l Parks II*").

i. *Proof of Competition*

Though HHS's assertions of competition within the bidding process[11] are contradicted,[12] HHS's assertion that MAOs compete to attract enrollees is sufficient to support HHS's burden of production and persuasion on this issue, as Dr. Biles admits that "low levels" of competition exist among MAOs in the marketplace, Biles Decl. ¶¶ 116–23; *see also* Pl.'s Mem. 29. "Actual competition" does not require high levels of competition, but only "actual" competition.

ii. *Proof of Substantial Competitive Harm*

"In reviewing an agency's determination as to substantial competitive harm, we recognize that 'predictive judgments are not capable of exact proof,' and we generally defer to the agency's predictive judgments as to "'repercussions of disclosure,'"" but conclusory statements from the agency do not suffice. *United Technologies Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 563 (D.C. Cir. 2010) (citations omitted). "Under FOIA, an agency has the burden to demonstrate that the withheld documents are exempt from disclosure, which it may meet by submitting 'affidavits [that] show, with reasonable specificity, why the documents fall within the exemption. The affidavits will not suffice if the agency's claims are conclusory, merely reciting statutory standards, or if they are too vague or sweeping.'" *In Def. of Animals v. U.S. Dep't of Agric.*, 501 F. Supp. 2d 1, 5–8 (D.D.C. 2007). The question here is whether or not HHS's claims are too "conclusory" or "vague" to survive Dr. Biles's motion for summary judgment.

---

[11] Def.'s Mem. 19.

[12] 76 Fed. Reg. at 21,518 ("Although Part C and D plans do compete for members, primarily through the benefits offered and the cost (member cost sharing and premium) of those benefits, they do not directly compete for the payments that CMS makes. Rather, we approve all sustainable bids that are otherwise qualified without preference for the lowest bidder.").

HHS's claims can be summarized by the following statement: "Releasing the requested . . . data would cause harm" "by providing propriety plan information that is not publicly available" that would (1) provide "insight" into "enrollment stability," "market shares," "market strategy," "target market," "market strength," utilization of services by enrollees, "financial details" and "position," "underlying costs," "efficiency of operations," "profit objectives," "cost structure," and "business growth strategies"; (2) enable "[c]ompetitors . . . to calculate—to a reasonable approximation based on educated estimates—the amount of an organization's bids," which would give competitors an "unfair competitive advantage in bidding for future MA contracts;" (3) enable competitors to "undermine [an MAO's] position by modifying their product design and pricing," "exploit[] difference[s] in cost and benefit design," and "devise strategies aimed at attracting beneficiaries with higher or lower scores" that would "disrupt [an MAO's] risk pool"; and (4) "reveal the economic nature of the [MAO's] contracts with its providers," which both "providers" and "competitors could use . . . to undercut [the MAO] in price negotiations."  Def.'s Mem. 15–18; Def.'s Reply 16–17, ECF No. 27; Theisen Decl. ¶¶ 10–11.

Only the last three points hold any hope of rising above conclusory claims of commercial harm, as mere observations that disclosure will provide "insight" into certain types of information fail to show *how* such "insight" creates a likelihood of substantial competitive harm and are therefore insufficient to establish HHS's burden of proof.  The last three points can be distilled into two claims: (1) the disclosure of the information will allow MAOs to make changes to their own practices (such as design, pricing, benefits, and price negotiations with providers) that would allow them to better compete with other MAOs, and (2) providers with which MAOs contract could use the data to manipulate the negotiation process.  *See* Theisen Decl. ¶ 10b.

HHS's assertion that disclosure will enable MAOs to change their practices to better compete with other MAOs is nothing more than arguing that disclosure has a likelihood of creating *competition* among MAOs—an assertion that does not necessarily prove that disclosure has a likelihood of creating *substantial competitive harm*, which implies an "unfair" exposure of one competitor to that competitor's detriment and to a non-exposed competitor's gain.[13] However, the last point regarding providers' ability to manipulate the negotiation process when contracting with MAOs could serve as proof of a likelihood of substantial competitive harm, as the providers may not be similarly exposed[14] and can therefore gain a commercial advantage over the MAO.

Still, HHS's assertions of competitive harm are rebutted by Dr. Biles, without an adequate evidentiary response from HHS, when Dr. Biles claims that (a) the 2009 requested data cannot cause competitive "harm" because the disclosure of the data is "symmetrical," meaning that all competitors are exposed to the same degree by the disclosure; (b) much of the data is already publicly available, which nullifies HHS's claims that the data is "confidential"; (c) the requested data is now stale for purposes of predicting MAOs' future bids, as it is retrospective, historical data rather than projective data and cannot be "trended" in order to make predictions because the data is only from a single year—2009.  Pl.'s Mem. 41–44.

---

[13] *See, e.g., Nat'l Parks II,* 547 F.2d at 678 n.18 ("The district court concluded that disclosure of the information by the Park Service would be useful to a competitor in devising means to improve its competitive position at the expense of the concessioner. Such disclosure would reveal concessioners' business secrets . . . without providing the concessioner in most instances with similar access to the books and records of his competitors.  *This competitive disadvantage is fundamentally unfair* and would be likely to cause harm to the concessioner's basic position.") (emphasis added); *see also Nat'l Parks*, 498 F.2d 765 at 768–69; *Pub. Citizen Health Research Grp. v. Nat'l Insts. for Health*, 209 F. Supp. 2d 37, 48 & n.7 (D.D.C. 2002); *Judicial Watch, Inc. v. Exp.-Imp. Bank*, 108 F. Supp. 2d 19, 29 (D.D.C. 2000); *Pub. Citizen Health Research Grp. v. FDA*, 997 F. Supp. 56, 65 (D.D.C. 1998).

[14] This is rebutted by Dr. Biles's claims that providers are similarly exposed by publicly available data.  *See* Biles Decl. ¶¶ 65–84.  These claims are somewhat disputed by HHS, but for different reasons unrelated to providers' ability to negotiate contracts with MAOs.  *See* Def.'s Reply 20–22 (arguing that the public cost data for providers, which has not commercially harmed those providers, is "entirely different" from the requested data in order to show that HHS's claims of competitive harm to MAOs are not nullified by the lack of commercial harm to providers).

a.  Asymmetrical Harm

Dr. Biles argues that, when *all* MAOs have access to the requested data, there is no risk of substantial competitive harm to an MAO because all of the MAOs have access to data to which every other MAO has access—preventing any one MAO from unfairly benefiting to the detriment of another MAO.  Pl.'s Mem. 2.  Dr. Biles refers to this as a lack of "asymmetric" disclosure and claims that asymmetric disclosure is required in order to prove substantial competitive harm.  Pl.'s Mem. at 30–33. (citing *Silverberg v. Dep't of Health & Human Servs.*, 1991 WL 633740, *4 (D.D.C. June 14, 1991) (reasoning that because each laboratory would have access to the same type of information as every other laboratory in the program, that no single laboratory would receive a competitive advantage over the other).  The Court does not need to determine whether or not asymmetric disclosure is required for substantial competitive harm.  However, precedent suggests that the "harm" aspect of "competitive harm" is an *unfair* commercial disadvantage by way of exposure.[15]  Thus, "asymmetric" disclosure, or the lack thereof, is valid evidence that can help establish or nullify a claim of substantial competitive harm.  HHS fails to explain why symmetric disclosure still poses a likelihood of substantial competitive harm, and, instead, only asserts that "asymmetrical competitive harm . . . has never been required [under Exemption 4]."  Def.'s Reply 12.  Pointing out what is not required to show substantial competitive harm is not affirmative evidence of competitive harm nor is it sufficient evidence to rebut Dr. Biles's claim.

b.  Public Availability of Requested Data

HHS admits that some information relating to the "bid" and the plan payment is already publicly available.  Rice Decl. ¶ 19, Rice Supp. Decl. ¶¶ 4–7, ECF No. 27-2.  However, HHS

---

[15] *See Nat'l Parks II,* 547 F.2d at 678 n.18 ("This competitive disadvantage is fundamentally unfair and would be likely to cause harm to the concessioner's basic position."); *see also supra* note 13 and accompanying text.

asserts: "The information requested by Dr. Biles goes far beyond the information that CMS proactively discloses to the public.  Release of the specific information requested by Dr. Biles will cause substantial harm to the competitive positions of [MAOs] . . . ."  Rice Decl. ¶ 16.  Dr. Biles rebuts that assertion by claiming that "[a]ny difference[s] between the data that is not public and the Worksheet 1 data are so small that they are irrelevant for analytic purposes by researchers[] or other MA[Os] and their consultants."  Biles Supp. Decl. ¶ 24.  HHS does not show—by numbers, specific examples, or any evidence beyond conclusory statements—how the portions of data requested by Dr. Biles that Dr. Biles claims can already be obtained by public means are materially different than the public data for purposes of competitive use.[16]

Dr. Biles argues that because "a considerable amount of the data sought is already public or can be calculated based on data published by CMS," any likelihood of substantial competitive harm must be considered in light of analogous data that is already available to MAOs.  Pl.'s Mem. 33.  The Court agrees.  But public availability of analogous data can cut both ways, as it can nullify claims that the requested data is confidential, but it can also make the requested data more harmful if the public data can be combined with the requested data to obtain commercial information that is likely to cause substantial competitive harm.

Whether or not some of the requested data is publicly available is clearly a "disputed fact" that is both material and a "genuine issue" upon which the case could turn because the public availability of the data would nullify HHS's Exemption Four claim: "Public availability of information defeats an argument that the disclosure of the information would likely cause competitive harm."  *Nat'l Cmty. Reinvestment Coal v. Nat'l Credit Union Admin.*, 290 F. Supp. 2d 124, 134 (D.D.C. 2003).  Thus, summary judgment in favor of HHS is inappropriate.

---

[16] HHS claims that Dr. Biles is "incorrect" to claim that certain portions of his requested data are essentially publicly available because the public data and the requested data are "not always identical" and are "different" in that the requested data is "more detail[ed]" than the public data and is "proprietary."  Rice Supp. Decl. ¶¶ 7, 9–11.

However, summary judgment in favor of Dr. Biles is still a possibility: if HHS fails to offer enough evidence to satisfy its burden of proof regarding competitive harm, it would be irrelevant whether or not the data is publicly available since Dr. Biles would automatically prevail.

### c.   Staleness of Requested Data

Regarding FOIA, this Circuit has recognized that "stale information is of little value."[17] *Payne Enterprises, Inc. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988).   HHS has not explained why the requested 2009 data is valuable to MAOs in light of Dr. Biles's claims that it is too stale and aged to be used for substantial competitive purposes.   Pl.'s Reply 22–23.   HHS recognized the concept of staleness in its rule-making response in 2011 where CMS, refuting MAO objections to the release of MAO payment data, argued that two-year-old payment data was stale and unlikely to harm MAOs: "[A]lthough trends from one year to the next might be revealed through release of payment data for sequential years, the fact remains that such trends will be stale (at least 2 years old) and reveal little about competitive strategies in future years." 76 Fed. Reg. at 21518.   At the earliest, MAOs could make use of the 2009 data in 2014.[18]   Biles Supp. Decl. ¶ 91.

Dr. Biles claims that the passing of time, as well as the changes in the health care industry, which include rising costs, health care reform under the Patient Protection and

---

[17] *See also JCI Metal Prods. v. U.S. Dep't of the Navy*, 2010 WL 2925436, *7 (S.D. Cal. July 23, 2010) ("any resulting competitive harm to JCI from the release of this 'stale' information would be minimal."); *N.Y. Times Co. v. U.S. Dep't of Labor*, 340 F. Supp. 2d 394, 402 (S.D.N.Y. 2004) (disclosure of information used to maintain a competitive advantage would not cause competitive injury if released four years later because the information is outdated); *Braintree Elec. Light Dep't v. Dep't of Energy*, 494 F. Supp. 287, 291 (D.D.C. 1980) ("One of the key issues in any exemption 4 case is the current significance of the commercial data"); *Boeing Co. v. Dep't of Air Force*, 616 F. Supp. 2d 40, 49 (D.D.C. 2009) (concluding that while the agency could properly withhold information about future rates, it had to disclose information about past rates).   *But cf. Wash. Psychiatric Soc. v. U.S. Office of Pers. Mgmt*, 1988 U.S. Dist. LEXIS 17609 (D.D.C. Oct. 12, 1988) (holding that documents submitted by insurance companies containing detailed compilations of benefit costs and user statistics could be used by competitors to redesign their benefit packages to seek a competitive advantage, even years after the data was submitted).

[18] Dr. Biles points out that "[c]ontracts with providers, benefits, and other internal MAO policies must be set well in advance of a calendar year, as these policies must be in place when Medicare beneficiaries select an MA plan for the Calendar Year 2013 during the 'open enrollment season' that begins October 15, 2012."   Biles Supp. Decl. ¶ 91.

Affordable Care Act,[19] changes in the way rebates are calculated, etc.[20]—make the 2009 data too stale to rise to the level of "substantial" commercial harm, if it rises to the level of any type of harm at all.  Pl.'s Reply 43.   HHS responds with the puny reply that Dr. Biles has "not connect[ed] changes in the health care system to the alleged staleness of the data"[21] and that "'[i]nformation does not become stale merely because it is old'"—citing a completely distinguishable case where this district held that old and no longer used air bag technology information was not stale because it would reveal to a competitor a "comprehensive picture of the progression of air bag technology over almost a decade," which would give a competitor "an edge in improving their own technology by not having to invest as much time and money in research and development."  Def.'s Reply 17–18 (citing *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 93 F. Supp. 2d 1 (D.D.C. 2000)).  Neither claim by HHS is sufficient to rebut Dr. Biles's claim that the data is too stale to cause a likelihood of commercial harm.

HHS also contends that "competitors could ascertain (or at least closely estimate) the amounts and component pieces of a given [MAO]'s *recent* bid," Rice Decl. ¶ 17 (emphasis added), and could use that knowledge to "undermine [an MAO's] position in the marketplace" "*if*" that competitor could access an MAO's bid information for all of its plans "*over a several year period.*"  Rice Decl. ¶ 22 (emphasis added).  Dr. Biles notes that, because he has only

---

[19] 26 U.S.C. § 5000A (2012).

[20] Dr. Biles lists the following relevant changes in the health care market since 2009: (1) The Affordable Care Act reduced MA payments that must continue to be reduced until the MA payments reach an average of 101% of costs in traditional Medicare in 2017 (down from an average of 114%), Biles Supp. Decl. ¶ 93; (2) The Affordable Care Act also changed payment policies that revise the calculation of MA payments based on counties, phasing in a new national policy based on placing all counties into one of four payment groups that benefits MAOs in areas with very high traditional Medicare costs and disadvantages MAOs in areas with low traditional Medicare costs, *Id.* ¶ 94, (3) CMS announced new bonus payments that will be awarded to MAOs based on the performance of the health care providers than an MAO contracts with, *Id.* ¶ 96.

[21] This claim is not only puny, but also inaccurate.  Dr. Biles clearly explains that the 2009 requested data would be stale in light of "major provisions" to the MA program, including a reduction in payments to MAOs, a new formula for MA plan payment benchmarks, a new formula for calculating the "rebate" to MA plans, and a new quality rating system that was initiated in 2012 that affects MAO payments.  Biles Decl. ¶¶ 124, 127–31.

requested historical cost data from 2009—a single year—and has not requested any projection data, the requested data cannot be trended.  Pl.'s Reply 13–14; 23; Def.'s Mem. Ex. 1.  Further, Dr. Biles claims that, because the 2009 data is now stale in the rapidly changing and non-linear healthcare market, MAOs cannot use the data effectively to predict an MAO's recent or future bid.  Pl.'s Mem. 2.  HHS's only rebuttal to these claims is an assertion that if Exemption Four does not protect this 2009 data, Exemption Four would not protect data from subsequent years, which would eventually have to be released and would then give researchers and other MAOs the ability to trend the data.  Def.'s Reply 19 n.5.  HHS's conclusion does not follow, as the request for the release of more recent data, as well as data over multiple years that could be trended, creates a distinguishable factual situation that requires a new analysis and new evidence of substantial competitive harm.[22]  Speculative assertions do not serve as affirmative evidence.

HHS has failed to explain why the 2009 data is still commercially valuable to competitors or how that data could be used in 2014 or later to create a likelihood of substantial competitive harm, thereby failing to meet its burden of proof in light of Dr. Biles's nullifying evidence.

### d.  HHS's Specific Claims Regarding the Requested Data

When there are various categories of data, the agency has the burden of establishing why or how each category of data is likely to cause substantial competitive harm.  *See S. Alliance for Clean Energy v. U.S. Dep't of Energy*, 2012 WL 1021487, *10–11 (D.D.C. Mar. 28, 2102); *Gov't Accountability Project*, 691 F. Supp. 2d at 179.  HHS does not explain how disclosure of Worksheet 1, Section II, Lines 1 ("Paid Through"), 4 ("Completion Factor"), 5 ("Plans in Base'), or 6 ("Describe the source of the base period experience data") could cause competitive harm.

---

[22] The Court's present holding applies only to the requested data from the single year (2009) from which it is requested.  Even if the exact same data were subsequently requested for, say, 2010 (a single year), the present holding does not act as a green light for disclosure.  As the Court expresses above, requests for additional years of data (even if requested in increments of single years) that would enable the presently requested data to be trended is a distinguishable set of facts that requires an entirely separate and new analysis.

HHS objects to disclosure of Section II, Line 2 ("Member Months") because release of that information would provide "insight into enrollment stability and market share." Rice Decl. ¶ 18; *see also* Marquis Decl. ¶ 24.  Dr. Biles contends that enrollment data is already publicly available, Pl.'s Mem. 38 (citing Rice Decl. ¶ 14 (stating that each month since August 2006, CMS has posted on its website the number of enrollees in each MA plan.)), but the public data's detail, as compared to the requested data's detail, is disputed by HHS.  Rice Supp. Decl. ¶ 7. Still, regardless of whether or not the data is publicly available, HHS fails to show *how* "insight into enrollment stability and market share" will likely cause substantial competitive harm to an MAO, thereby failing to meet its burden of proof for this claim.

In addition to HHS/CMS employees, several MAO officials provided declarations in support of HHS.  The MAO officials' main objections regarded the release of Section II "risk scores," Section III "cost structure" and "utilization patterns," and Section VI "expenses" and "profit/loss by plan."  Theisen Decl. ¶¶ 5, 9–11; Yui Decl. ¶ 14.

HHS contends that the disclosure of risk scores would "enable . . . competitors to devise strategies aimed at unfairly attracting beneficiaries with higher or lower [health] scores," which would "disrupt [an MAO's] risk pool" and "violate CMS's requirement that plans 'not design benefit packages that discourage enrollment or encourage disenrollment of severely or chronically ill beneficiaries.'"  Theisen Decl. ¶¶ 5a, 10a.  However, HHS does not explain how a competitor would use the 2009 data to "devise strategies" or what those "strategies" would be and has not offered any evidence that affirms that an MAO would actually engage in the claimed activity that apparently violates a CMS requirement.  It is difficult to understand how MAOs could successfully violate a "requirement" of CMS for very long without repercussions, and it is equally unclear why it would be "unfair[]" for competitors to try and attract beneficiaries with

better or worse health when all MAOs would have equal access to the risk data and could therefore all try to do the same thing. Further, "attracting beneficiaries" by way of "strategies" seems highly speculative when beneficiaries choose to enroll in a specific plan with a specific MAO based on various personal factors. *See* Biles Decl. ¶¶ 28–32, 135. Additionally, Dr. Biles claims that risk scores, to the extent they would be used by competitors, are already publicly available. Pl.'s Reply 14, 18–19 (citing Rice Supp. Decl. ¶ 10). HHS asserts that the public risk scores are "not always identical" to the risk scores in Worksheet 1, but fails to explain why the difference between the scores is commercially significant.[23] HHS's vague, speculative claims and conclusory rebuttals to Dr. Biles's counter evidence do not satisfy its evidentiary burden.

MAO officials claim that "cost structure" and "utilization patterns" data in Section III would allow competitors or providers to use the information to "undercut [an MAO] in price negotiations" when contracting. Yui Dec. ¶ 14; Theisen Decl ¶¶ 5b, 10b–c, 11. Dr. Biles claims that the symmetric disclosure of the data, Pl.'s Reply 9–13, the stale nature of the 2009 data, Biles Supp. Decl. ¶¶ 91–96; Biles Decl. ¶ 124–27, the existing public and industry knowledge of cost and utilization information, Biles Supp. Decl. ¶ 63, the inability to trend the requested data, Pl.'s Reply 15–16, and the "high level of aggregation" of the Section III data[24] prevents a

---

[23] HHS notes that the non-ESRD risk score requested by Dr. Biles is "not always identical to the risk score that CMS makes public." Rice Supp. Decl. ¶ 8. The actual risk score for each MAO is retroactively calculated and is publicly available, while the projected risk score (the risk score Dr. Biles is requesting) is the risk score upon which the bid is based is not publicly available. Biles Supp. Decl. ¶ 25. Though HHS asserts that the actual risk score and the projected risk score could differ, Rice Supp. Decl. ¶ 8, Dr. Biles notes that HHS does not offer any data substantiating the implied assertion of actual difference between projected and actual risk scores and explains that, since MAOs have until June of the submission year to submit actuarially-certified risk score data, the projected risk score should be quite close to the actual risk score. Biles Supp. Decl. ¶ 26. "Actuaries preparing Worksheet 1 for an MAO would, in light of past experience with the MAO's enrollee pool, have a good understanding of the health status of the MAO's enrollees" (which is the essence of the risk score). *Id.* Since MAO actuaries have access to actual risk scores for past years for all MAO plans and since the future projected risk scores are logically similar to past plan risk scores, any difference between the projected and actual risk scores should be so minimal as to make any difference irrelevant for purposes of research or competitors. *Id.*

[24] Dr. Biles explains that costs per member per month data is a combination of three factors and that the Section III data "masks the relationship among [the three factors] for any individual plan, making it impossible to discern the extent to which a particular factor is responsible for cost." Biles Decl. ¶ 113. "These numbers are at a high level of

competitor or a provider from effectively using the requested data to manipulate contract negotiations, Biles Decl. ¶ 113. HHS fails to explain *how* a competing MAO or provider would use the requested 2009 data to "undercut" an MAO in contract negotiations and does not provide sufficient evidence to rebut Dr. Biles's contradicting and possibly nullifying claims.

Finally, HHS asserts that Section VI cost data would "provide information about the efficiency of operations and the financial position of the organization." Rice Decl ¶ 20. Here, HHS's claims are again too conclusory to satisfy their burden of proof. "Efficiency" and "financial position" are highly generalized terms that do not, in themselves, prove competitive harm; stating that disclosure of cost information would reveal "financial position" could describe any sort of disclosure of MAO information, including the disclosure of payment and enrollment information that CMS has already made public. MAO officials, on behalf of HHS, claim that the "expenses" and "profit/loss by plan" data in Section VI would "allow competitors and network providers to build business strategies to unfairly target [an MAO's] specific cost structure." Theisen Decl. ¶ 5c. These claims are rebutted by Dr. Biles's assertions of staleness, symmetric disclosure, and public availability of the requested data. Biles Supp. Decl. ¶¶ 85–96; Pl.'s Reply 9–13. But regardless of Dr. Biles's contradicting evidence, an assertion that a competitor or provider would "build business strategies to unfairly target [an MAO's] specific cost structure," without further explaining how the disclosure of the requested data would facilitate that activity, is exactly the sort of vague claim that is unacceptable as evidence of commercial harm.

### e. HHS's Burden

HHS contends that releasing the requested data would "cause harm" by providing "proprietary plan information" that is not publicly available, which would result in "insight" into

---

aggregation so that a competing [MAO] could not learn anything about another [MAO's] internal contracting policies with hospitals or physicians or how their strategy for managing utilization of high costs procedures . . . is designed." *Id.*

various aspects of an MAO's operations like "market strategy" and "financial details."  Rice Decl. ¶ 18.  HHS asserts that disclosure of the information would be "inappropriate" and "unfair."  Rice Decl. ¶¶ 21–22; Marquis Decl, ¶ 26.  Crucial, and missing, in HHS's evidence is exactly *how* all of these consequences of disclosure would cause a likelihood of substantial competitive harm to MAOs.  *See Gov't Accountability Project*, 691 F. Supp. 2d at 175–76, 178–79 (agency failed to show "how" competitor would use data to its advantage or to competitor's disadvantage ).  HHS does not even give examples of the extent of the harm or the type of harm that would occur if the requested data were released.  HHS has the burden of showing that *substantial* competitive *harm* is *likely*.  HHS has failed to provide a single non-conclusory claim that asserts anything beyond a *possibility* of *competition* and has failed to rebut Dr. Biles's nullifying evidence with affirmative, non-conclusory counter evidence.  "Conclusory and generalized allegations of substantial competitive harm, of course, are unacceptable and cannot support an agency's decision to withhold requested documents."  *Pub. Citizen Health Research Grp. v. FDA*, 704 F.2d 1280, 1291 (D.C. Cir. 1983).  Assuming that HHS's claims are true, HHS has failed to meet its burden of proving that disclosure of the requested information will likely cause substantial competitive harm.  Thus, summary judgment in favor of Dr. Biles is appropriate.

## IV.    ATTORNEYS' FEES AND COSTS

Dr. Biles has moved for attorneys' fees and costs.  Pl.'s Compl. 5 ¶ 5 (Relief).  Though Dr. Biles has prevailed and though FOIA gives this Court authority to award attorneys' fees to Dr. Biles, 5 U.S.C. § (a)(4)(E)(i) (2012), the Court will not address that request here.  Pursuant to the local rules, the Court shall "enter an order directing the parties to confer and to attempt to reach agreement on fee issues" and shall set a status conference at which the Court will (1)

determine whether settlement of any and or all aspects of the fee matter has been reached, (2) enter judgment for any fee on which agreement has been reached, (3) make the determination regarding pending appeals required by paragraph (b) of LCvR 54.2, and (4) set an appropriate schedule for completion of the fee litigation.

## V.    CONCLUSION

For the foregoing reasons, defendant's Motion for Summary Judgment will be DENIED and plaintiff's Motion for Summary Judgment will be GRANTED.   Defendant is ordered to disclose to plaintiff, in the form requested by plaintiff, all information requested in plaintiff's July 18, 2011, FOIA request submitted to CMS.

A separate Order consistent with this Memorandum Opinion shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on March 21, 2013.